**IN THE COURT OF APPEALS OF IOWA**

No. 22-0514
Filed June 29, 2022

**IN THE INTEREST OF J.M. and L.M.,**
**Minor Children,**

**J.M., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Madison County, Kevin Parker, District Associate Judge.

A mother appeals the termination of her parental rights to her two children. **AFFIRMED.**

Bryan Webber of Carr Law Firm, P.L.C., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Tara M. Elcock of Elcock Law Firm, P.L.C., Indianola, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

The mother in this appeal candidly testified that when the State petitioned to terminate her parental rights to her two children, born in 2014 and 2015, "it smacked me in the face . . . and I had a heart-to-heart with myself . . . I want to be a good mom. I want my kids. My kids love me, and I love my kids. I want to be there for them." The juvenile court found this professed desire for change was not enough to avoid termination under Iowa Code section 232.116(1)(e) and (*l*) (2021). The mother appeals, challenging each of the three steps in the termination framework, arguing the court should have exercised the less-restrictive alternative of placing the children in the father's custody, and maintaining she should have been granted more time to work toward reunification. We affirm.

## I.    Background Facts and Proceedings

The mother began using illegal drugs when she was twelve years old. She started with marijuana, before progressing to methamphetamine when she was eighteen. Her drug use led to a long history of involvement with the Iowa Department of Human Services dating back to 2005. The most recent case started in 2017 and closed a year later with a bridge order placing the children involved in this appeal in the parents' joint physical care.

In April 2020, the mother showed up at the paternal grandmother's home to get the children outside of her regular parenting time. Neighbors called the police, and the mother was charged with assault, although she later pleaded guilty to a reduced charge of disorderly conduct. Six months went by with no contact between the mother and children. Then, in September 2020, the mother showed up at the children's school and took them home with her.

When the father went to the mother's home to get the children, he discovered they were not there and "smelled a heavy scent of marijuana smoke." The father called the police, who searched the residence and found marijuana, marijuana paraphernalia, and methamphetamine paraphernalia containing residue in areas accessible to the children. Once the mother returned home with the children, she was arrested. A report was made to the department, which again became involved with the family. The mother agreed to a safety plan placing the children in their father's custody, with supervised visits for the mother. The State filed child-in-need-of-assistance petitions in October. Following a pretrial conference in November, the court ordered the children to remain in the father's legal custody. In December, the children were adjudicated as in need of the court's assistance under Iowa Code section 232.2(6)(c)(2) and (n) (2020).

The mother obtained a substance-abuse evaluation in December. The evaluator concluded the mother "does meet DSM 5 criteria for Severe Amphetamine-type Use Disorder in full sustained remission and Severe Cannabis Use Disorder" and recommended extended outpatient treatment. After this evaluation, the mother was evasive with the department's attempts at drug testing. The department initiated sweat-patch testing of the mother in December, but she later said her patch fell off. Then, in early January 2021, the mother was charged with possession of drug paraphernalia. About a week later, the department directed the mother to have another patch applied, and the mother reported she "would find a way to get there as soon as possible." A week went by, and the mother never showed. The mother later proposed hair-stat testing instead, but the department had been provided with a message the mother sent to another person

on social media, stating: "Hey lady I have a question. What hair dye or product would a person use to strip the hair of all toxins and everything, weed, pills, coke, e[tc]."

By the time of the dispositional hearing in late January, the mother had yet to begin substance-abuse or mental-health treatment. In February, she self-reported for a chemical-dependency evaluation, and another evaluator concluded she met "DSM 5 criteria for Moderate Cannabis Use Disorder and Moderate Amphetamine-type Use Disorder." This evaluator recommended clinically-managed, high-intensity residential treatment.

At the April review hearing, which the mother did not attend, the department reported the mother had recently been arrested for driving while barred and possession of marijuana. She had also failed to follow through with entering residential treatment. The mother finally entered inpatient treatment aimed at her substance-abuse and mental-health issues in mid-May, but she left the program just three days later. When the next review hearing was held in late July—a hearing the mother again missed—she had not re-engaged in any substance-abuse or mental-health services. The mother had also remained unemployed and without stable housing since before the proceedings began, bouncing between friends' houses. As a result of the mother's instability, the department changed its recommendation from a transfer of custody to the father to termination of the mother's rights.

The mother underwent yet another substance-abuse evaluation in August, leading to a recommendation for extended outpatient treatment. She provided a sweat-patch test negative for all substances around the same time. However, the

mother was incarcerated for most of the time she was wearing the patch. The mother began treatment in September, around the same time the State filed termination petitions. By October, her counselor reported she consistently attended sessions and, while she tested positive for THC twice, "the level for each test d[id] not indicate active use" and "[b]oth tests were negative for all other substances." A department report also explained the mother "has been engaged in services and has not demonstrated any behavior indicators of using methamphetamines."

A termination hearing was held in early November. Although the mother had recently tested positive for THC a third time, her substance-abuse counselor testified the results did not show active use. The mother testified she had not used since July 25. She explained that she was incarcerated on that date and, after she was released from jail seven days later, she remained sober while staying with her sister. Before the hearing, the mother told the department her sister was key to her sobriety—that she would be unable to remain sober living anywhere else. But the sister reported that she was just helping the mother get on her feet, and the living situation was temporary.

At the termination hearing, the mother requested a six-month extension or transfer of custody to the father instead of termination. By then, the mother had consistently attended visitation and treatment for a couple of months. She had also obtained employment and was still living with her sister. In its post-hearing review order, the court noted the permanency goal was transfer of custody to the father and took the mother's request for an extension under advisement. But in March 2022, the court entered an order for termination. Despite the mother's

recent positive steps, the court terminated her rights under Iowa Code section 232.116(1)(e) and (*l*) (2021) without specific discussion of the statutory requirements of these sections as related to the facts.[1] *See In re S.W.*, No. 15-0549, 2015 WL 3635722, at *4 (Iowa Ct. App. June 10, 2015) (proceeding to review statutory grounds for termination in the same circumstance).

## II.    Analysis

We apply a three-step analysis in conducting our de novo review of terminations of parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) (noting that in conducting our de novo review, we "give weight to the [court's] factual findings but are not bound by them"); *see also* Iowa Code § 232.116(1)–(3). If all three steps support termination, we consider the ancillary issues of whether an alternative to termination should be exercised or a parent should be granted additional time. *See* Iowa Code § 232.117(5); *see also id.* § 232.104(2)(b), (d).

### A.    Grounds for Termination

The mother challenges the sufficiency of the evidence supporting termination under Iowa Code section 232.116(1)(e) and (*l*). "On appeal, we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

---

[1] Though we are able to review the court's ruling despite its minimal factual findings, we urge the court to provide us with a more thorough analysis given the importance of the issues before us.

We choose to focus on section 232.116(1)(e).  As to that provision, the mother first challenges the second element—whether the children were *removed* from her physical custody.[2]  *See* Iowa Code § 232.116(1)(e)(2).  The State argues the mother failed to preserve error on this issue.  Whether she preserved error or not, the record discloses the parents shared physical care of the children when the child-in-need-of-assistance proceedings began.  Soon after, the court ordered the children be placed in the father's custody, with visitation for the mother at the discretion of the department.  This amounted to a change in physical custody, not stasis, and the removal requirement was therefore satisfied.  *See In re C.F.-H.*, 889 N.W.2d 201, 206–07 (Iowa 2016); *In re H.B.-H*, No. 21-1153, 2021 WL 5467301, at *1 (Iowa Ct. App. Nov. 23, 2021).

Turning to the third element under section 232.116(1)(e), which the mother also contests, the State needed to prove two requirements by clear and convincing evidence: "'the parents (1) have not maintained *significant and meaningful contact* with the child during the previous six consecutive months and (2) have made *no reasonable efforts* to resume care of the child despite being given the opportunity to do so.'"  *In re T.S.*, 868 N.W.2d 425, 437 (Iowa Ct App. 2015) (quoting Iowa Code § 232.116(1)(e)(3)).  The term

> "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent.  This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with

---

[2] The first element of section 232.116(1)(e)(1) requires a finding that the children have been adjudicated as children in need of assistance under section 232.96. There is no dispute this element has been met.

the child, and requires that the parents establish and maintain a place of importance in the child's life.

*Id.* In challenging this element, the mother argues she was taking advantage of her minimal opportunities for visitation, the frequency of which she says was hampered by the department.

At the termination hearing, the mother testified she was not allowed visits for roughly four months—from about April through July 2021—despite calling or texting the department's caseworker "daily." On appeal, the mother suggests the department unreasonably "halted" her visits and argues "the system failed in function by not providing suitable opportunity for [her] to resume care of [the] children." *Cf. In re A.L.*, 492 N.W.2d 198, 201 (Iowa Ct. App. 1992). Yet the mother agreed that during those months, she was actively using, not engaged in treatment, and in and out of jail. And the orders from that time do not show the mother made requests for visitation, noting: "No additional services are requested." Although the mother resurfaced in late July, she had to go back to jail in mid-August. While she was absent during these months, there is no evidence the mother called, wrote, or otherwise sought to maintain contact with the children. We find that any failure to have more frequent interactions in this window of time was attributable to the mother. *See In re K.M.B.*, No. 12-0306, 2012 WL 1247156, at *3 (Iowa Ct. App. Apr. 11, 2012) (finding the father's "failure to maintain significant and meaningful contact with the children was a result of his own poor choices—not the actions of [the department] as he insisted at the termination hearing").

The mother did not begin to consistently exercise her opportunities for visitation, or engage in substance-abuse and mental-health treatment, until roughly two months before the termination hearing. This was at a time when termination proceedings were already recommended. Though commendable, "[s]pecific and meaningful contact" involves affirmatively assuming "the duties encompassed by the role of being a parent." Iowa Code § 232.116(1)(e)(3). The mother has not performed the rudimentary duties of a parent, like being involved in their schooling or therapy, leaving that to the children's father and grandmother. She has also not provided for the children financially. Her failure to engage in treatment or attend visitation until two months before the termination hearing shows a lack of continued interest in the children and a failure to make "a genuine effort to complete the responsibilities prescribed in the case permanency plan." *See T.S.*, 868 N.W.2d at 437 (finding a parent who "engaged in some services" and "participated in visitation" was not enough to show significant and meaningful contact). Thus, the State established the mother did not maintain significant and meaningful contact with the children.

That brings us to the second prong, whether the mother made "no reasonable efforts to resume care of the child[ren] despite being given the opportunity to do so." Iowa Code § 232.116(1)(e)(3). Answering this question "requires a qualitative analysis of her efforts—a look at the substance of her conduct, not just the form." *T.S.*, 868 N.W.2d at 438. As noted, we reject the mother's position that she was not given an opportunity to resume care of the children. On our review, we cannot conclude that the mother's conduct, namely taking no positive steps until termination was imminent, amounted to reasonable

efforts to resume care of the children. We accordingly find the evidence sufficient to support termination under section 232.116(1)(e).

### B. Best Interests and Statutory Exception

The mother argues termination is not in the children's best interests, *see* Iowa Code § 232.116(2), because of the closeness of the parent-child bonds. *See id.* § 232.116(3)(c). We will separately address the best-interests and statutory-exception arguments. *See In re A.S.*, 906 N.W.2d 467, 472–73 (Iowa 2019) (discussing three-step termination framework).

In determining whether termination is in the best interests of children, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). The defining elements of a child's best interests are safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

The children have been out of the mother's care for several years. The mother did not meaningfully participate in services until the few months before the termination hearing. She has not progressed beyond fully supervised visits, and she has been unable to provide stability and permanency for the children. She has not lent a helping hand to minister to the children's safety, nurturing and growth, or needs. On our review, we agree with the juvenile court that the children's need for stability and permanency and best interests are best served by termination.

As for the mother's request to apply the statutory exception to termination in Iowa Code section 232.116(3)(c), we first note the application of a statutory

exception to termination, if one exists, is "permissive, not mandatory." *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (quoting *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014)). While there was a bond between the mother and children, we conclude she failed to show "that the termination would be detrimental to the child[ren] . . . due to the closeness of the parent-child relationship." The mother presented no evidence the children would suffer physical, mental, or emotional detriment if her rights were terminated. On the contrary, the record discloses that in the four months when the mother had no contact with the children, they were largely unaffected. We conclude this exception to termination does not apply.

### C. Alternative to Termination

The mother argues a less restrictive option to termination involving transfer of sole custody to the father should have been exercised. Iowa Code section 232.117(5) authorizes the juvenile court, following a termination hearing, to enter an order in accordance with section 232.104 instead of terminating parental rights. Section 232.104(2)(d)(2) allows for an order transferring "sole custody of the child[ren] from one parent to another parent." But to exercise one of the options under section 232.104(2)(d), "convincing evidence must exist showing that," among other requirements, "termination of the parent-child relationship would not be in the best interest of the child." Iowa Code § 232.104(4).

We have already concluded termination of the mother's parental rights is in the children's best interests. So one of the necessary prerequisites to triggering a permanency analysis under section 232.104(2)(d) is not satisfied. *See In re A.M.*, No. 20-1685, 2021 WL 815892, at *4 (Iowa Ct. App. Mar. 3, 2021). And it is not in children's best interests to interpret chapter 232 "to prevent termination of the

noncustodial parent's rights when the children are placed in the separate home of the other parent." *In re N.M.*, 491 N.W.2d 153, 155 (Iowa 1992). On our de novo review, we reject the mother's request for this alternative permanency option.

### D. Additional Time

The mother finally argues the court erred in declining to grant her additional time to work toward reunification, contending she "made significant progress" in addressing her substance abuse toward the end of the proceedings.[3] *See* Iowa Code § 232.117(5); *see also id.* § 232.104(2)(b). The mother ignores her long history of substance abuse, coupled with the fact that she only engaged in treatment for a short time and only when faced with termination. Also concerning is the mother's report to the department "that she was only sober due to being under the care of her sister," which was a temporary living situation, "and if living anywhere else she would not be able to stay sober from substances." Given the mother's record, she would need to demonstrate sobriety for a long time before the children could be placed in her care. So we cannot conclude "the need for removal . . . will no longer exist at the end of the additional six-month period," Iowa Code § 232.104(2)(b), and we deny the mother's request for an extension.

### III. Conclusion

We affirm the termination of the mother's parental rights.

**AFFIRMED.**

---

[3] The mother also asserts the denial of her request for more time violates her rights to due process and equal protection. These constitutional claims were neither raised or decided in the juvenile court and are therefore not preserved. *See In re K.C.*, 660 N.W.2d 29, 38 (Iowa 2003) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal.").